# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROBERT E. REILLY,**

**Plaintiff,**

**-vs-**                                   **Case No. 6:07-cv-2042-Orl-GJK**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Robert E. Reilly ("Reilly") appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. *See* Doc. No. 1. For the reasons set forth below, it is ordered that the Commissioner's decision is **AFFIRMED**.[1]

## I.    BACKGROUND

Reilly was born on November 18, 1959, and has a high school education. R. 73, 306. Reilly's past employment experience is primarily in construction, and his last employment as a mason ended on March 4, 2005. R. 121-27, 307. Reilly alleges an onset of disability as of March 5, 2005. R. 15, 73, 302; Doc. Nos. 11 at 2, 12 at 1.[2]  It appears that Reilly filed an

---

[1] Pursuant to the Scheduling Order, the Court dispenses with oral argument as unnecessary.  Doc. No. 7.

[2] A review of the record reveals that it fails to contain an application for disability benefits.  At the hearing before the Administrative Law Judge ("ALJ") on February 6, 2007, he stated that the application was filed on June 15, 2005, and alleged an onset date of March 5, 2005.  R. 302.  The filing and onset dates are similarly reported in the ALJ's April 17, 2007, decision.  R. 15.  In Reilly's memorandum on appeal he states a filing date of June 15, 2005, but an onset date of March 15, 2005.  Doc. No. 11 at 2 (citing R. at 302).  In the Commissioner's memorandum, he states a filing date of June 15, 2005, and onset date of March 5, 2005.  Doc. No. 12 at 1 (citing R. at 15, 74).  Neither party cites to an actual application in the record.

application for disability benefits on June 15, 2005. *Id.* On November 15, 2005, Reilly's application was denied initially and, on April 13, 2006, the application was denied again upon reconsideration. R. 51-55. On May 2, 2006, Reilly requested a hearing before an Administrative Law Judge ("ALJ") and, on February 6, 2007, a hearing was held before the Honorable Henry U. Snavely. R. 300-329.

At the hearing, Reilly was represented by attorney Bruce W. Jacobus. R. 300. Reilly was the only person to testify at the hearing. R. 300-29. Reilly testified to the following in pertinent part:

- He has been diagnosed with multiple sclerosis and is currently in treatment;

- He has not looked for work since his seizure on March 4, 2005;

- He has not received any vocational rehabilitation;

- He spends a lot of the day laying down or relaxing because of pain;

- He has constant pain throughout his entire body and sometimes it gets so bad he cannot get out of bed and it hurts to shower. He describes his pain on some days as a ten on a scale of 1-10, and other days it is a three, but he is in pain all time;

- He watches television; he helps out with household chores; cooks; and can do the laundry. He takes care of his own personal hygiene and grooming needs;

- He used to golf, but has not golfed since December of 2006 and, at that time, he could not complete a full round;

- He goes to the beach every now and then;

- He does not drive do to the seizures;

- He has blurred vision in his left eye;

- His current primary treating physician is Dr. Scott Gold;

- On a bad day, which is about every other day, his coordination and perception are off, and he stays in bed;

- He does not do much because he is afraid he will hurt himself or injure his family;

- He has extreme problems with short term memory, but his long term memory is intact; and

- He has chronic fatigue.

R. 300-29.

On April 17, 2007, the ALJ issued an unfavorable opinion finding Reilly not disabled. R. 15-25. In his decision, the ALJ made the following pertinent findings:

1. Reilly meets the disability insured status requirements of the Social Security Act through December 31, 2009;

2. Reilly has not engaged in substantial gainful activity since March 5, 2005;

3. Reilly has the following severe impairments: multiple sclerosis; obesity; a cognitive disorder; and an adjustment disorder;

4. Reilly does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments;

5. After careful consideration of the entire record, I find that Reilly has the RFC to perform the exertional demands of light work. Reilly has postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling. Reilly needs to avoid extreme cold, heat, and vibration. Reilly needs to avoid unprotected heights and moving machinery. Reilly can perform simple and repetitive tasks on a sustained basis;

6. Reilly is unable to perform any past relevant work;

7. Reilly was born on November 18, 1959, and was 45 years old [on the alleged disability onset date], which is defined as a younger individual 45-49;

8. Reilly has at least a high school education and is able to communicate in English;

9. Transferability of job skills is not material to the determination of disability due to the claimant's age;

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform; and

11. Reilly has not been under a "disability," as defined in the Social Security Act, from March 5, 2005, through the date of this decision.

R. 17-25. In reaching his decision, the ALJ provided an exhaustive review of all the medical records, consulting examinations, medical source statements, non-examining consultations, and Reilly's testimony. R. 18-23. The ALJ made the following finding regarding Reilly's subjective testimony:

> After considering all of the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.
> . . .
> The claimant's subjective complaints and symptoms, including his allegations of fatigue, pain and limitations, have been carefully compared to the other evidence. The claimant's testimony and other reports show that he lives a fully functional type lifestyle, which is consistent with the medical evidence. The claimant is able to take care of his personal needs. He is able to wash the dishes, cook and run the vacuum. He can drive, take out the trash and go to the grocery store. He makes dinner a few times a week, does household repairs and the laundry. He is able to weed the yard, golf, watch television and go to the beach. He was able to go on a cruise and goes to his children's sporting events. He tolerates his medication well. In fact, his multiple sclerosis is in stable condition. Activities and reports such as these are inconsistent with his allegations of incapacitating limitations or pain. This is not to minimize the medical impairments demonstrated in the record. The claimant does have impairments that limit his activities with heavy lifting. However, the clinical findings resulting from these impairments do not appear to be of producing pain or limitations of incapacitating proportions. Accordingly, I find that the claimant's allegations and subjective symptoms

4

> beyond what could be expected considering the objective laboratory and clinical findings.

R. 22-23.  In reaching his decision, the ALJ also discounted or gave little weight to some of the

opinions contained in the treating physician's, Dr. Scott Gold, medical source opinion.  R. 22-23.

Regarding Dr. Gold, the ALJ stated the following:

> . . . Dr. Gold opined that the claimant could sit, stand, and walk only two hours in an eight-hour workday.  He also opined that the claimant had limitations with feeling as well as pushing and pulling.  I normally accord greater weight to the opinions of a treating physician; however, his opinion must be supported by the objective medical evidence.  Dr. Gold's own progress notes do not support this assessment.  The claimant's MRI scans have shown no decline in his condition.  The claimant has not had any seizures.  The claimant even stated that his symptoms have not worsened.  In fact, when he stopped taking his Warfarin, his diffuse pain had resolved.  Moreover, Dr. Gold's impression is that his multiple sclerosis is "stable."  The only finding on physical examination is some diminished sensation in his limbs.  Otherwise, the claimant's motor examination is normal as well as his gait.  Neurologically, progress notes show he is intact.  Dr. Rivera's examination showed the claimant's hand-grip and his coordination were normal.  There were no abnormalities in his cervical, thoracic, and lumbar spine.[3] This further does not support Dr. Gold's opinion that the claimant has any deficits with feeling, pushing, or pulling.  Dr. Rivera opined that based on the claimant's ability to perform work-related activities such as sitting, standing, walking, or lifting were not affected.  Therefore, based upon the overall objective medical evidence and the minimal findings on physical examinations, I agree with the State Agency [consultants] that the claimant would be limited to light exertion.  I do agree with Dr. Gold and the State Agency [consultants] that the claimant does have postural and environmental limitations.

R. 22-23.  Reilly requested review of the ALJ's decision before the Appeals Council, submitting

new evidence which consisted of a July 27, 2007, letter from Dr. Scott Gold.  R. 8, 294.   The

---

[3] This finding is inconsistent with MRIs taken in 2001 and 2004 which showed a large disc herniation at the L5-S1. R. 146, 150.

letter states the following:

> Multiple Sclerosis is an autoimmune condition of the nervous system that produces neurological deficits especially cognitive impairments, and severe fatigue. The cognitive dysfunction often involves inattention, loss of multitasking, loss of working memory, and short-term memory impairment. It is not something that can be reliably measured on a routine neurological examination in the office. Likewise, fatigue is not something that I can measure on my examination or that is demonstrable on an MRI or other test. It is not pure muscle fatigue, but impaired energy production within the body caused by the autoimmune process, which fails more easily in MS patients. It is not something that improves with rest. Even treating the underlying condition does not reverse this fatigue. The cognitive impairment and fatigue, which are prominent problems manifest by Mr. Reilly, are among the most common symptoms of MS and often the most disabling. Mr. Reilly's cognitive impairment and fatigue are the primary reasons for his inability to engage in gainful employment and specifically to engage in activity requiring more than two hours of sitting, standing, concentration, or other activities.

R. 294. On November 30, 2007, the Appeals Council denied review, finding that the new information provided by Reilly did not provide a basis for changing the decision of the ALJ. R. 5-8. On December 31, 2007, Reilly timely filed a appeal in the district court. Doc. No. 1. On May 12, 2008, Reilly filed a memorandum in support of his position on appeal. Doc. No. 11. On July 2, 2008, the Commissioner filed a memorandum in support of the ALJ's determination. Doc. No. 12. The appeal is now ripe for review.

## II.    THE PARTIES' POSITIONS

Reilly assigns three errors to the Commissioner's decision: (1) the Appeals Council should have remanded the case to the ALJ for consideration of new evidence, namely, the July 27, 2007 letter from Dr. Gold, and Reilly requests that the Court remand the case to the ALJ for

said consideration;[4] (2) the ALJ erred by not affording controlling weight to the opinion of Dr. Gold because substantial objective evidence supported his opinion and good cause did not exist to discount it; and (3) the ALJ erred by failing to obtain the testimony of a vocational expert ("VE") because substantial evidence of severe non-exertional impairments existed requiring the testimony of a VE. Doc. No. 11.

The Commissioner argues that substantial evidence supports his decision to deny Reilly his claim for disability benefits. He maintains that: (1) Dr. Gold's letter is not new evidence and, even if the letter could be considered new evidence, it would not have changed the ALJ's determination because good cause existed to discount the opinion of Dr. Gold; (2) the ALJ had good cause to discount the opinion of Dr. Gold because it was inconsistent with his own treatment records and the other objective medical evidence; and (3) the ALJ did not err by not obtaining the testimony of a VE because the mere presence of non-exertional limitations does not automatically require VE testimony, and if a claimant's non-exertional limitations do not significantly limit a wide range of work at a given level, then testimony from a VE is not required. Doc. No. 12.

### III.    <u>MEDICAL HISTORY</u>

The record on appeal contains the following pertinent medical history:

On November 8, 2001, Reilly presented to Dr. Robert Paxson complaining of numbness in his lower extremities. R. 150. An MRI revealed a large right recess disc herniation at the L5-S1 encroaching on the thecal sac and probably on the right S1 nerve root. R. 150. At the L4-5, a small central protrusion as well as signal intensity changes were present which were consistent

---

[4] Although not specifically stated by Reilly in his memorandum, he is requesting a remand pursuant to sentence six of Section 405(g).

with a tear in the posterior annular fibers. *Id*. The record does not contain an contemporaneous treatment notes or procedures.

On February 13, 2004, Dr. Paxson ordered another MRI of the lumbar spine. R. 146. The findings were as follows:

> There is degenerative disc space narrowing with desiccation at the L4-5 and L5-S1. The conus terminates appropriately at the L1-2 level. The vertebral bodies show normal marrow signal intensity. The neural foramina are patent, and the spinal canal is adequate in caliber. At L4-5, there is a very small broad-based central disc protrusion, which indents the ventral thecal sac, exhibiting minimal mass effect. At L5-S1, there is a large broad-based disc herniation, which protrudes into the ventral thecal sac with slight effacement of the lateral recesses, left greater than right. This disc herniation measures 12mm in size. At the L1-2 level, there is a 5mm low signal intensity structure at the level of the neural foramen far to the left laterally. This projects within the paravertebral soft tissues, and does not appear to exhibit significant mass effect on the spinal structures. This is of uncertain etiology, perhaps a focus of calibration or vascular structure. This extends beyond the filed of view and is of doubtful clinical significance.

R. 146. The conclusions drawn from the results of the MRI were: (1) Large central disc herniation at L5-S1 with significant mass effect in the ventral extra-dural space; and (2) Small central disc protrusion at the L4-5 without significant mass effect. R. 147. The record does not contain any other significant treatment records related directly to Reilly's lumbar spine.

On March 4, 2005, while laying block off of a scaffold, Reilly became disorientated, developed numbness in the right arm, and a headache. R. 121, 123, 126, 307. Reilly was confused and unable to communicate. R. 123. He was helped off the scaffold and taken to the emergency room. R. 12, 123, 126, 307. At the emergency room, a CT scan of the brain revealed a mass in the left parietal white matter of the brain. R. 123. Reilly was seen by Dr. Fairuz F. Matuk and Dr. Richard P. Newman. R. 172. Dr. Matuk's differential diagnosis was a malignant

brain tumor ("glioblastoma multiforme, lymphoma and metastic disease"). R. 123, 172. Reilly was admitted to the hospital and placed on Decardon, Dilantin, and Zantac which resulted in some improvement. R. 123-24.

> He denies headaches now. He denies visual disturbances. He tells me that he has been somewhat confused and having problems with his memory over the past day or two. He says that the numbness in his right arm and leg has resolved almost completely. He does not report any neck stiffness.

R. 123. On March 5, 2002, a physical examination by Dr. Matuk revealed the following in pertinent part:

> On examination he is alert. He is slightly confused with a memory disturbance to the events surrounding the incident yesterday. He does admit his recollection is somewhat poor. He, for example, cannot recall why his brother died.[5] He also exhibits an element of exertional dysphasia. He has no dysarthria. There is no evidence of head trauma. His gait was not tested. His pupils are equal and reacting to light consensually. Extraocular movements and visual fields are full. He has no nystagmus. He moves his face symmetrically. Sensations all over the face are intact. His hearing is adequate. He moves the tongue and palate in the midline. He shrugs both shoulders equally. He has no carotid bruits. He has good pulses universally. He has no significant rash or joint deformities. He has no peripheral edema, clubbing or cyanosis. Motor exam shows a mild lag of the right arm upon attempted synchronous evaluation. He, otherwise, exhibits good proximal and distal function universally. The tone is normal. No abnormal movements are noted. Deep reflexes are very sluggish universally but are symmetrical. Plantars are flexor bilaterally. He has a sensory inattention along the right side of his body. He exhibits left disorientation and finger agnosia. He has no cerebellar decompensation to movements. The remainder of the exam is unremarkable.

R. 124-25. Dr. Matuk placed Reilly on steroids and anticonvulsants. R. 125. Dr. Matuk

---

[5] A family history taken by the emergency room revealed that Reilly's brother died of an intracranial aneurysm at the age of 52. R. 124.

recommended a stereotactic brain biopsy or a craniotomy. R. 125.

On March 9, 2005, Dr. Matuk's notes reveal that after Reilly was placed on steroids and anticonvulsants, "[h]is symptoms improved significantly." R. 121. No headaches, seizures, or visual disturbances were present. R. 121. Reilly was able to walk without a limp, he had no ataxia, and a Romberg's test was negative. R. 121. Motor examination showed "good proximal and distal strength in the upper and lower extremities, except for mild clumsiness of the right hand." R. 122.

> He has finger agnosia with mild left-to-right disorientation. He has no sensory inattention. He has no cerebellar decomposition to movements.

R. 122. Dr. Matuk continued to recommend either a stereostatic brain biopsy or craniotomy with stereotactic localization. R. 122.

On March 15, 2005, Reilly was seen again by Dr. Richard P. Newman. R. 172-73. Dr. Newman's notes reveal that the mass on Reilly's brain "had the appearance of a primary malignant brain tumor." R. 172. Reilly's condition had deteriorated somewhat with increasing right arm weakness, confusion, and poor memory. R. 172. Another MRI showed that the mass or lesion was growing and the edema was worse. R. 172. Upon physical examination, Reilly was awake and alert; had mild expressive dysphasia; had appropriate affect, "except that [Dr. Newman did] not think he [understood] the gravity of his condition"; no visual field defects; symmetrical face; and he was able to move all four extremities without difficulty. R. 172. Dr. Newman opined that his "crude estimate is that [the lesion had] grown 20% in volume in the last 11 days and that he has increasing cerebral edema." R. 172. Dr. Newman added an additional steroid and stressed the need for an immediate brain biopsy. R. 172.

Notes reviewed by Dr. Sherrill R. Loring of Shands Hospital reveal that on March 15, 2005, Reilly was again admitted into the emergency room for another seizure like event. R. 126.

> On 3/15/2005, he had the onset of another event. He describes "not feeling right." He felt dizzy, and his head felt "cloudy." His right arm began tingling. He was conversive, but he "rambled" and did not make much sense. He was taken back to the Emergency Room and a CT head showed changes that looked to be increased swelling around the lesion in question. His Decadron was increased. . . . It took him longer to clear from this event. It took approximately 24 hours for everything to clear, whereas on his initial event he was significantly clear later in the day.

R. 126. Thereafter, Reilly was referred to Shands Hospital and, on March 25, 2005, Reilly underwent surgery. Dr. Loring's April 12, 2005, notes reveal the following:

> He was subsequently referred to Neurosurgery here at Shands and saw Dr. Friedman. He saw Neurosurgery on 3/22/2005 and a stereotactic biopsy and surgical resection was done on 03/25/2005. Pathology report did not disclose any evidence of tumor, and it was felt to be compatible with demyelination. He was not continued on Dilantin and was discharged on Decadron. He has felt well since returning home. He has had some weight gain from the steroids. He has no headache. No difficulty with his language, and his right side is felt to have good strength.

R. 126. Dr. Loring's impressions and recommendations were as follows:

> Mr. Reilly [has] no prior neurologic history . . . until his acute presentation on 03/04/2005. His acute event sounds very much to have been a partial seizure referable to the lobulated enhancing lesion that was found in the left parietal region. I agree this looked very suspicious for a tumor, but pathology has not shown evidence of that and pathology report is more consistent with a demyelinating lesion. . . . Again, Mr. Reilly has noting on exam except minimal findings referable to the left parietal lesion and no previous history of any neurological symptoms. He presents with a single enhancing lesion, and the acute event that brought this to clinical attention was a seizure. This is very unusual for demyelinating disease (multiple sclerosis) to present like this. There is certainly not enough evidence at this time to diagnose him with multiple sclerosis. There is no "dissemination in time and

> space". This may be an unusual one time clinical episode of
> demyelination. I have discussed with him the diagnosis of MS and
> how this is reached. He and his wife have a better understanding
> regarding diagnosing demyelinating disease. To further evaluate
> this as a possibility, I would like to perform MRI's of the spine and
> do a repeat MRI of the brain. We will also arrange for a lumbar
> puncture to look for routine studies along with IgG and oligoclonal
> bands. If these additional studies are unrevealing, then I feel that
> Mr. Reilly will certainly need to be followed closely and with
> repeat imaging studies at intervals down the road. . . . He is not to
> drive.

R. 127 (emphasis added).

After the biopsy, Reilly continued treatment with Dr. Paxson. R. 151-64. On May 18,
2005, Reilly presented to Dr. Newman suffering from chest pain. R. 170. Dr. Newman
diagnosed Reilly with pneumonia. R. 170-71. Reilly reported that until the onset of chest pain,
he was moving all extremities and had no neurologic issues. R. 170. Upon physical
examination, Reilly was able to move all extremities; he was awake, alert, and well-orientated;
and his face was symmetric. R. 170. Dr. Newman noted that there appeared to be a presumptive
diagnosis of multiple sclerosis, but he found that diagnosis "rather unusual in a lesion that is
continuing to grow rather than shrink after this time." R. 170. Dr. Newman's notes reveal that
he was still concerned that the lesion might be a malignant brain tumor. *Id.* It appears that
another MRI of the brain was performed on May 20, 2005. R. 176.

On June 28, 2005, Reilly was seen again by Dr. Newman for re-evaluation. R. 169. Dr.
Newman's notes reflect the following:

> His symptoms have virtually cleared. He has trouble with right left
> orientation when he drives. His strength is good. He is
> occasionally forgetful. His speech is clear. He's had no visual
> loss. He had a biopsy which showed demyelination rather than
> tumor and his lesion shrunk about 60% . . . a month ago. On
> examination he is awake, alert, and well orientated. He did not

> have right left disorientation today. He has normal vision fields.
> He had good strength in the extremities.
>
> . . .
>
> This might well have been tumefactive multiple sclerosis. My plan
> for him is to repeat MRI in a month. I will then, assuming there is
> not evidence of mass effect, do a lumbar puncture. He is
> understanding of this.

R. 169. On July 13, 2005, another MRI of the brain was performed. R. 176. The results of the MRI revealed "no enhancing lesions," and "[n]o mass effect or midline shift." R. 176.

On July 27, 2005, Reilly presented to Dr. Jamie Furman, with recurrent swelling in left lower extremity. R. 192. Dr. Furman's notes reflect that Reilly had previously been admitted to the hospital for an episode of pneumonia. R. 192. On July 21, 2005, a CT scan of the chest revealed that the pneumonia had improved significantly. R. 192. After his discharge, he developed swelling in the left lower extremity. Upon examination, Dr. Furman discovered deep vein thrombosis with associated pulmonary embolism. R. 192. Reilly was admitted to the hospital. R. 192. A review of his systems revealed: no headaches, dizziness, light headedness, weakness or numbness; no anxiety or emotional instability; no blurred vision; no chest pain; and no weakness or joint swelling. R. 192. Upon physical examination, Reilly appeared to be in no acute distress; he was alert, awake, and orientated to time, place and person; his reflexes were normal. R. 192. Dr. Furman prescribed Coumadin for the deep vein thrombosis and a venous doppler ultrasound. R. 19. On July 29, 2005, a review of the doppler venous imaging of the left lower extremity revealed the following:

> Current examination shows a thrombus in the popliteal vein and
> possibly the distal superficial femoral vein. There is no evidence
> of a flow in both venous structures. It is unclear whether the
> thrombus is chronic in nature or secondary to recurrent disease.
> Clinical correlation recommended. The rest of the deep venous
> system as well as the superficial venous system of the left lower

> extremity appear unremarkable and shows no intrinsic echogenic
> lesion. These venous structures demonstrate good compressibility
> without tenderness and compression.

R. 178. Reilly continued on anticoagulation therapy with Heparin and Coumadin. R. 183. The record does not contain and follow-up treatment notes specifically related to the deep vein thrombosis.

### Consultative Neurological Evaluation – Dr. Rivera – October 3, 2005

On October 3, 2005, Reilly presented to Dr. Miguel Rivera for a consultative neurological evaluation related to his disability claim. R. 183-86. Dr. Rivera's notes reflect that Reilly was currently taking Coumadin, Dilantin, and Hydrocodone. R. 184. A review of Reilly systems showed: increased fatigue, but no significant weight change; no blurred vision or visual disturbances; no hearing loss; no chest pain; joint pain and muscle weakness were present; occasional confusion, but no nervousness, depression, hallucinations or insomnia. R. 184. Upon neurological examination, Reilly was orientated to person, place and time; exhibited some confusion with dates; coherent speech; normal thought processes and behavior; and recent and remote memory were "fairly intact." R. 184. Reilly's muscle tone was normal with no evidence of spasticity, rigidity or hypotonicity. R. 185. Reilly's muscle strength was 5/5 for all four extremities and his hand grip was bilaterally equal. R. 185. Reilly was able to move his extremities without any pronator drift. R. 185. Reilly's cervical, thoracic, and lumbar spine were unremarkable with no evidence of spasm involving the paraspinal musculature. R. 185. Reilly did not require an assistive device for walking, and his gait and station were normal. R. 185. Dr. Rivera made the following conclusions regarding Reilly's functional abilities:

> Mr. Reilly's ability to perform work-related activities such as
> sitting, standing, walking, lifting, carrying, handling objects,

> hearing, speaking and traveling are not affected. His ability to do work related mental activities involving understanding and memory, sustained concentration and persistence, social interaction and adaptation are not entirely affected.

R. 186.

### **Dr. Gold**

On October 5, 2005, Reilly presented to Dr. Scott Gold complaining of fatigue, insomnia, memory loss, disequilibrium, numbness, tingling, and weakness. R. 189. Dr. Gold's notes show that Reilly was currently taking Phenytoin, Warfarin, and Hydrocodone. R. 189. Upon physical examination, Reilly was in no acute distress; he was alert, oriented, conversant, and pleasant; and had a full range of motion in his neck. R. 190. Upon mental status examination, Reilly missed the date by three days, but was able to follow three-step sequential commands without difficulty. R. 190. "He was unable to recall any of three objects after three minutes, but could recognize two from a list." R. 190. Reilly's visual fields were normal. Reilly had normal tone, strength, and a full range of motion in all four extremities. Dr. Gold diagnosed Reilly with Multiple Sclerosis, tumifactive type, with current major symptoms of seizure disorder, confusion/cognitive difficulty, right hand in-coordination and diffuse pain. R. 190. Dr. Gold recommended further testing and substituting Keppra for Dilantin. R. 191. Dr. Gold opined that Reilly was having a possible adverse reaction to the Dilantin, "especially pain, incoordination, and cognitive dysfunction." R. 191

The record indicates that Reilly was not treated again until February 15, 2006, when he presented to Dr. Gold for a follow-up appointment. R. 278. Dr. Gold's initial summary notes state the following:

> Mr. Reilly returned today for follow-up of Multiple Sclerosis. I

15

initially saw him on 10/05/05. He still complains of diffuse pain, "throughout my body." It seems to fluctuate and skip some days. It is quite severe at time and interferes with sleep. It escalates about every two to three weeks. He is better in other respects, with improved attitude. He has not had any recent seizures and is tolerating Keppra well. He feels that his medication may also be helping with some of his pain. He started Rebif approximately November or December and is tolerating it without much difficulty. He occasionally has some chills and fatigue associated with Rebif, but these are usually not severe. He has been receiving IVMP every two months. It makes him anxious and restless for a few days. He remains on Coumadin. There are several other somatic complaints, as noted below in the Review of Systems.

R. 278. Reilly continued to complain of fatigue, fever/chills, memory loss, back pain, muscle pain, and joint pain. R. 279. Dr. Gold's review of symptoms also notes that Reilly was complaining of blurred vision. R. 279. Physical exam revealed no acute distress and full range of motion in the neck. R. 279. Neurological exam showed Reilly was orientated and attentive with recent/remote memory intact. R. 279. Reilly displayed normal tone, strength, and full range of motion in all extremities. R. 280. Reilly's sensation, however, was diminished distally in all four limbs to all modalities. R. 280. Reilly's gait and station were unremarkable. R. 280. Dr. Gold continued to opine that Reilly may be having an adverse reaction to Dilantin. R. 280.

On June 29, 2006, Reilly present to Dr. Gold showing significant improvement. R. 275. Since stopping Warfarin, Reilly's diffuse pains had resolved. R. 275. Reilly's primary complaints were short-term memory loss and fatigue, which was worse with heat. R. 275. Reilly had not had any recent exacerbations or decline in his condition. R. 275. Dr. Gold compared MRI's from March 5. 2005 and June 27, 2006, and reported "marked improvement with no further enhancement." R. 275. Dr. Gold scheduled Reilly for a follow-up appointment in four months. R. 277.

On February 8, 2007, a MRI revealed mild left periventricular hypointensity, but was otherwise unremarkable.  R. 292.

### RFC – Dr. Donald – November 7, 2005

On November 7, 2005, a non-examining state agency consultant, Dr. Morford Donald, completed a Physical Residual Functional Capacity Assessment ("RFC") of Reilly.  R. 210-17. Dr. Donald made a primary diagnosis of left parietal demyelination, a secondary diagnosis of partial seizures, and other alleged impairments of recurrent deep vein thrombosis of the left lower extremity. R. 210.  Dr. Donald opined that Reilly's conditions and symptoms resulted in the following exertional limitations: (1) occasionally lifting and/or carrying a maximum twenty pounds; (2) frequently lifting and/or carrying a maximum of ten pounds; (3) standing and/or walking about six hours in an eight hour workday; (4) sitting with normal breaks for about six hours in an eight hour workday; and (5) no limitations in pushing and/or pulling.  R. 211.  It appears that Dr. Donald based his conclusions on the available medical record to date.  R. 211-12.  Dr. Donald opined that Reilly's postural limitations included never being able to climb ladders, ropes, or scaffolds, but he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl.  R. 212.  Dr. Donald opined that Reilly had no manipulative, visual, or communicative limitations.  R. 213-14. Dr. Donald concluded that Reilly should avoid concentrated exposure to extreme heat, cold, fumes, and hazards, but had no limitations to humidity, noise, wetness, or vibration. R. 214.  Dr. Donald found the severity of Reilly's claims "credible."  R. 215.  Dr. Donald maintained that he had reviewed treating or examining statements in the record and that his conclusions were not significantly different.  R. 216.

<u>**RFC – Dr. Peckoo – February 26, 2006**</u>

On February 26, 2006, a non-examining state agency consultant, Dr. Jennifer Peckoo, completed an RFC of Reilly.   R. 218-25.  Dr. Peckoo made a primary diagnosis of possible multiple sclerosis and a secondary diagnosis of seizures.  R. 218. Dr. Peckoo opined that Reilly's conditions and symptoms resulted in the following exertional limitations: (1) occasionally lifting and/or carrying a maximum twenty pounds; (2) frequently lifting and/or carrying a maximum of ten pounds; (3) standing and/or walking about six hours in an eight hour workday; (4) sitting with normal breaks for about six hours in an eight hour workday; and (5) no limitations in pushing and/or pulling.  R. 219.  Dr. Peckoo stated that her opinions were based on several episodes of balance problems, possible multiple sclerosis, and "mostly okay" October 2005 and November 2005 examinations except for deep vein thrombosis and some memory problems.  R. 219.  It appears that Dr. Peckoo based her conclusions on the available medical record to date. R. 219.  Dr. Peckoo opined that Reilly's postural limitations included never being able to climb ladders, ropes, or scaffolds, but he could occasionally climb ramps or stairs.  R. 220.  Dr. Peckoo opined that Reilly could frequently balance, stoop, kneel, crouch, and crawl.  R. 220.  Dr. Peckoo based her opinions on Reilly's multiple sclerosis like symptoms.  R. 220.  Dr. Peckoo opined that Reilly had no manipulative, visual, or communicative limitations.   R. 220-22.  Dr. Peckoo concluded that Reilly should avoid even moderate exposure to hazards, avoid concentrated exposure to extreme heat, cold, and vibrations, but had no limitations to humidity, noise, wetness, or fumes.  R. 222.  Dr. Peckoo stated that there "is some credible findings to document

allegation of disability based on MER.  RFC of light is most appropriate for current findings."

R. 223.  Dr. Peckoo maintained that she had not reviewed a treating source statement.  R. 224.

**Mental Status Examination and Memory Assessment – March 24, 2006**

On March 24, 2006, Reilly presented for a consultative mental and memory examination before Drs. Wende J. Anderson and Barbara M. Paulillo.  R. 226-31.  Reilly was extremely pleasant and cooperative throughout the examination, excellent rapport was established, but he displayed difficulty with focus and concentration with significant memory difficulties.  R. 226-27.  The Weschsler Memory Scale – III ("WMS-III") was administered with the following results:

> Mr. Reilly's immediate memory falls within the Borderline range of functioning.  His ability to recall visual and auditory information immediately after presentation each fall within the Borderline range.  In terms of general delayed memory, Mr. Reilly demonstrates functioning within the Borderline range in terms of his ability to recall visual and auditory information subsequent to a twenty-five minute delay.  In contrast, his ability to recognize auditory information subsequent to a delay falls within the Low Average range.  His ability to maintain concentration and mental control also falls within the Low Average range.  The difference between Mr. Reilly's ability to maintain concentration and mental control and his immediate memory is statistically significant, as is the difference between his ability to maintain concentration and mental control and his memory for delayed information.

R. 230.  Regarding Mr. Reilly's daily functioning:

> Mr. Reilly reported, in terms of his activities of daily living, that he was capable of engaging in household tasks, although he was required to limit his efforts due to concerns about exhaustion.  He stated that he experienced some confusion when managing his money, and reported that his wife currently handled the household bills.  In terms of task completion and goal-achievement, Mr. Reilly reported that he experienced intermittent difficulty.  He stated that, on a "good day," he was capable of attaining the goals he set.  Mr. Reilly reported that on a "bad day," he was incapable

19

> of completing his tasks. . . . Mr. Reilly demonstrated the ability to
> follow simple sets of instructions during the evaluation.
> Concentration problems were highly apparent. Adaptability,
> persistence and sustainability all appear to fall within normal
> limits. Pace of evaluation fell within normal limits. No periods of
> decompensation were evident.

R. 230. Reilly was diagnosed with chronic adjustment disorder with mixed anxiety and depressed mood, and cognitive disorder not otherwise specified ("NOS"). R. 230. "Mr. Reilly is currently experiencing adjustment problems to a life-long incapacitating illness. Prognosis is guarded." R. 230.

### Psychiatric Review and MRFC – Dr. Wiener – April 11, 2006

On April 11, 2006, a non-examining state agency consultant, Dr. Eric Wiener, completed a Psychiatric Review and Mental Residual Functional Capacity Assessment ("MRFC"). R. 232-49. The Psychiatric Review found an organic mental disorder (cognitive disorder NOS) and affective disorder (adjustment disorder). R. 232-33, 235. Dr. Wiener concluded that these disorders would cause moderate functional limitations in: activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. R. 242. Dr. Wiener based his findings on the available medical record and consultative evaluations, including that of Drs. Anderson and Paulillo. R. 244. Dr. Wiener concluded that "[o]verall, the claimant has some credible cognitive changes due to brain changes that impose limits [on his functioning] though less than marked." R. 244.

In the MRFC, Dr. Wiener opined that Reilly was moderately limited in the following abilities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

20

consistent pace without an unreasonable number and length of rest periods; and interacting appropriately with the general public. R. 246-47. Dr. Wiener opined that Reilly was not significantly limited in any other area. R. 246-47. Dr. Wiener made the following conclusions regarding Reilly's MRFC:

> The claimant has some cognitive and emotional issues which would appear to limit the claimant to more basic, routine tasks in a low demanding work environment. The claimant might need a work environment with only brief interactions with others. If not experiencing seizure activity, the claimant would appear capable of negotiating usual work hazards and changes.

R. 248.

### Medical Source Statement – Dr. Gold – January 30, 2007

On January 30, 2007, Dr. Gold provided a medical source statement concerning Reilly's ability to do work related activities. R. 271-274. Dr. Gold opined that Reilly had the following abilities/limitations:

- Occasionally lift/carry a maximum of 50 pounds;

- Frequently lift/carry a maximum of 20 pounds;

- Stand/walk a maximum of 2 hours in an eight hour work day;

- Sit a maximum of 2 hours in an eight hour work day;

- Sit for 45 minutes before having to change positions;

- Stand for 10 minutes before having to change positions;

- Walk for 5 minutes before having to change positions;

- Reilly will need the opportunity to shift at will from sitting, standing, or walking;

- Reilly will need to lie down at unpredictable intervals during a work shift; and

- Reilly will need to lie down 3 to 4 time per work shift;

R. 271.  Dr. Gold stated that Reilly's neurological history and examinations supported the above opinion.  R. 272.  Dr. Gold further opined that Reilly can occasionally: twist; stoop; crouch; climb stairs; and work over head during an eight hour work day, but he can never climb ladders. R. 272.  Dr. Gold stated that Reilly's condition will not affect his ability to reach, handle, or manipulate with his fingers, but his condition will affect his ability to feel and push or pull.  R. 272.  According to Dr. Gold, Reilly should avoid all exposure to: extreme heat; humidity; fumes, orders, dusts, gases, and poor ventilation; and hazards such as machinery and heights.  R. 272. Reilly should also avoid moderate exposure to extreme cold, but he had no restrictions to wetness or noise.  R. 272.  Dr. Gold also stated that Reilly's ability to concentrate and his memory difficulties would be affected by his impairments. R. 273.  Dr. Gold opined that Reilly would miss work about three times a month due to his condition, and that his condition was permanent.  R. 273.  Dr. Gold's ultimate opinion was that Reilly had reached maximum medical improvement on June 29, 2006, but was permanently unable to work.  R. 273-74.

## IV.    LEGAL STANDARDS

### A.    THE ALJ'S FIVE-STEP DISABILITY ANALYSIS

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b).  Substantial gainful activity ("SGA") is

defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves performing significant physical or mental activities. 20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized. 20 CFR §§ 404.1572(b), 416.972(b). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 CFR §§ 404.1574, 404.1575, 416.974, 416.975. If an individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear

to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Comm'r*, 265 F.3d 1214, 1219 (11th Cir. 2001). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listing(s)"). 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's RFC. 20 CFR §§ 404.1520(e), 416.920(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments. In making this finding, the ALJ must also consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b). The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965. If the claimant has the RFC to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth and final step.

At the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled. Although the claimant generally

continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

**B.      THE STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to

determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord*, *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

The district court may remand a case to the Commissioner for a rehearing under sentences four or six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089-92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99

F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's RFC); *accord*, *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work).[6]  In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1) that there is new, non-cumulative evidence; 2) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090-92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).  A sentence-six remand

---

[6] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.[7]

## V.    ANALYSIS OF ALLEGED ERRORS

### A.    Whether the Appeals Council Erred By Not Remanding For New Evidence.

As set forth above, the Appeal Council received a letter from Dr. Gold after the ALJ's decision. R. 294. Reilly argues that letter constitutes "new and noncumulative" evidence and the Appeals Council committed should have remanded the case to ALJ for consideration of it. Doc. No. 11 at 9-10 (citing *Caulder v. Bown*, 791 F.2d 872, 877 (11th Cir. 1986)). In *Caulder*, 791 F.2d at 877, the Eleventh Circuit held that before a case will be remanded for consideration of new evidence, a claimant must establish the following:

> (1) there is new, noncumulative evidence; (2) the evidence is "material," that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for the failure to submit the evidence at the administrative level.

*Id*. (internal citations omitted). Reilly's argument fails the first two prongs of the *Caulder* analysis. *Id*. First, in his memorandum, Reilly admits that the letter was merely an explanation of the medical source opinion previously provided by Dr. Gold. Doc. No. 11. The medical source opinion, clearly opined that Reilly was disabled from gainful employment due to multiple sclerosis and that the condition limited his functional ability to perform work-related activities. R. 271-74. In his decision, the ALJ thoroughly discussed the treating notes and medical source opinion of Dr. Gold. R. 21-22. Thus, Dr. Gold's letter is not new and is cumulative. Second, the ALJ provided good cause, as will be discussed below, for discounting the ultimate opinion of

---

[7] With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Id*. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id.*

Dr. Gold. Therefore, it is extremely unlikely that the letter would change the administrative result.

**B.      Whether the ALJ Erred By Discounting Dr. Gold's Opinion.**

As set forth above, Reilly argues that Dr. Gold's opinion should have been given controlling weight because it was supported by substantial evidence and good cause did not exist to give it less than controlling weight. Doc. No. 11 at 11-12. Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the ALJ's sequential process for determining disability. The opinions or findings of a non-examining physician are entitled to little weight when they contradict the opinions or findings of an examining physician. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ may, however, reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Nonetheless, the ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).[8] Absent good cause, the opinions of treating or examining physicians must be accorded substantial or considerable weight. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

> Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or

---

[8] The Regulations maintain that the administrative law judges "will always give good reasons in [their] . . . decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).

> inconsistent with the doctor's own medical records." *Phillips v.
> Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir.2004) (citations
> omitted); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th
> Cir.1991); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th
> Cir.1986).

*Johnson v. Barnhart*, 138 Fed.Appx. 266, 269 (11th Cir. 2005). "The opinion of a non-examining physician does not establish the good cause necessary to reject the opinion of a treating physician." *Johnson,* 138 Fed.Appx. at 269. Moreover, the opinions of a non-examining physician do not constitute substantial evidence when standing alone. *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

In the present case the ALJ provided a detailed review of Dr. Gold's treatment notes and medical source opinion. R. 21-22. The ALJ found Dr. Gold's ultimate opinion contrary to his own treatment notes and contrary to the weight of the objective medical evidence. R. 22-23. Specifically, the ALJ noted Dr. Gold's treatment notes showed that Reilly's diffuse pain was resolved when he stopped taking Warfarin and that his motor examination, strength, gait, and coordination were normal. R. 22. These findings are contrary to Dr. Gold's ultimate opinion that Reilly could stand, walk, and sit for only two hours in an eight-hour workday and would need the opportunity to shift positions. R. 21. Furthermore, Dr. Gold's opinion was contrary to the findings of Dr. Rivera, an examining physician. R. 23; *see* supra p. 14. Based on the forgoing, the ALJ clearly articulated good cause for discounting portions of Dr. Gold's opinion.

## C.    Whether the ALJ Erred By Failing to Obtain VE Testimony.

As set forth above, Reilly maintains that the ALJ erred by failing to obtain the testimony of a VE because of the existence of several severe non-exertional impairments: fatigue, weakness, and pain. Doc. No. 11 at 12-13. According to Reilly, when such non-exertional

impairments exist, an ALJ is required to obtain the testimony of a VE. *Id*. (citing *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985)). The ALJ determined that Reilly has the RFC to perform the exertional demands of light work, but was unable to perform any past relevant work. R. 17, 23. In determining that there are jobs that exist in significant numbers in the national economy that Reilly can perform, the ALJ stated the following:

> In determining whether a successful adjustment to other work can be made, I must consider the claimant's [RFC], age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the Medical-Vocational Rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile. When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the Medical-Vocational Rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations. If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making.
>
> . . .
>
> If the claimant had the [RFC] to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rules 202.20, 202.21, and 202.22. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule. Social Security Ruling 83-14 and 85-15 states that stooping and bending are required only occasionally at the light exertional level. Crouching is not required. Some limitations in climbing and balancing are not significant. Kneeling and crawling do not have a significant impact on the broad world of work. Environmental restrictions are insignificant at all exertional levels.

R. 24 (emphasis added). In *Sryock*, 764 F.2d at 836, the Eleventh Circuit stated the following

about an ALJ's use of the guidelines:

> At a given residual functional capacity, if a claimant is capable of some work at that level but not a full range of work, then that level of the grids is not applicable. [Med.-Voc. Guidelines] at §§ 201.00(h), (i), 202.00(b); [other citations omitted]. Second, in determining residual functional capacity only exertional limitations are considered, i.e. ability to lift, stand, push, pull, handle, etc. If a claimant has nonexertional impairments that significantly limit the ability to do basic work activities-for example, sensory impairments such as skin or respiratory sensitivity and mental or emotional impairments-then the grid regulations do not apply. *Id.* at § 200.00(e).

> However, when both exertional and nonexertional work impairments exist the grids may still be applicable. "[N]on-exertional limitations can cause the grid to be inapplicable only when the limitations are severe enough to prevent a wide range of gainful employment at the designated level." *Murray v. Heckler*, 737 F.2d 934, 935 (11th Cir.1984); *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536-37 (6th Cir.1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Therefore, when both exertional and nonexertional limitations affect a claimant's ability to work, the ALJ should make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. Courts will review this determination only to determine whether it is supported by substantial evidence. *See Murray*, 737 F.2d at 935; *Allen v. Secretary of Health and Human Services*, 726 F.2d 1470, 1473 (9th Cir.1984); *Dellolio v. Heckler*, 705 F.2d 123, 127-28 (5th Cir.1983); *Hernandez v. Heckler*, 704 F.2d 857, 862 (5th Cir.1983); *Kirk*, 667 F.2d at 537.

*Id.* (emphasis added). When considering Reilly's nonexertional limitations, the ALJ need only

determine whether Reilly's nonexertional impairments significantly limit his basic work skills.

*Phillips v. Barnhart*, 357 F.3d 1232, 1243 (11th Cir. 2004). If nonexertional impairments do not

significantly limit his basic work skills, testimony from a VE is not required. *Phillips*, 357 F.3d

at 1243. In the present case, the ALJ specifically found that Reilly could perform full range of light work and his additional limitations had little or no effect on his ability to perform work related activities. R. 24. Based on the objective medical records, the ALJ's comprehensive review of the record, and his RFC determination, substantial evidence exists to support the ALJ's determination that Reilly's nonexertional limitations had little or no effect on his ability to do light work. Thus, the ALJ was not required to obtain the testimony of a VE.

VI.     **CONCLUSION**

For the reasons stated above, it is **ORDERED** that the Commissioner's decision is **AFFIRMED**. The Clerk is directed to enter a separate judgment in favor of the Commissioner and close the case.

**DONE and ORDERED** in Orlando, Florida on March 24, 2009.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

Krista L. Rush
Bradley K. Boyd, P.A.
1310 West Eau Gallie Blvd.
Suite D
Melbourne, Florida     32935

Susan R. Waldron
U.S. Attorney's Office
Suite 3200
400 N. Tampa St.
Tampa, Florida          33602

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Nadine DeLuca Elder, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920


The Honorable Henry U. Snavely
Administrative Law Judge
c/o Social Security Administration
Office of Disability Adjudication and Review
Suite 300
3505 Lake Lynda Dr.
Orlando, FL 32817-9801